UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
UNITED STATES OF AMERICA,                                 :
                                                          :
        -against-                                         :        MEMORANDUM DECISION
                                                          :            AND ORDER
CARL VAN PUTTEN,                                           :
                        Defendant.                        :        04 Crim. 803 (GBD)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

        Defendant is a 50-year-old inmate who was convicted of murder while engaged in a

narcotics conspiracy in 2006 and received a life sentence, of which he has now served 19 years.

(*See* Judgment, ECF No. 48, at 1–2.)   He brings this motion to reduce his sentence on

compassionate release grounds pursuant to 18 U.S.C. § 3582(c)(1)(A), arguing that extraordinary

and compelling reasons exist to warrant a reduction.   Specifically, Defendant asserts the following

bases as sufficient to garner a reduced sentence: Judge Peter K. Leisure's (the "Sentencing Court")

reliance on its mistaken belief regarding the frequency of life sentences for federal defendants

convicted of murder, the harshness of his sentence as compared to both federal murder defendants

nationwide and the other participants in the murder,[1] legal developments that now reduce the

penalties for crack cocaine-related offenses, the law's changed perspective of how younger age

affects criminal responsibility, and his rehabilitation efforts while in prison.   (*See* Mem. in Supp.

---

[1] This Court hereinafter refers to the other participants in the crime as "accomplices" since the other
participants were not indicted or tried alongside Defendant, and thus were not his co-defendants.

Mot. to Reduce Sentence ("Def.'s Mem."), ECF No. 95.)   For the reasons explained below, Defendant's motion is GRANTED to the extent that his sentence is reduced to 30 years.

## I.      FACTUAL BACKGROUND

Defendant was a crack-cocaine dealer from approximately 1995 through 1998, as part of a criminal organization led by Andrew Lang, termed the Lang Organization.   Van Putten Presentence Investigation Report ("PSR") ¶¶ 8, 15. The Lang Organization was a violent narcotics organization that operated in various locations of the Hunts Point neighborhood of the Bronx, New York.  *Id.*  Defendant additionally operated as a manager for the Lang Organization, supervising other dealers during particular shifts and allowing the Lang Organization "to use his nearby apartment as a 'stash house,'" where money, drugs, and firearms were stored. *Id.* ¶ 11.

In October 1995, when Defendant was 21 years old, the Lang Organization was at odds with the victim, Mr. Curet, a rival drug dealer who distributed narcotics in the vicinity of the Lang Organization.  *Id.* ¶ 12.  The Lang Organization had several confrontations with Curet around this time, and Curet eventually told "Lang, San Martin, [Defendant], and other workers to stop selling near his drug spot."  *Id.*  In instances of conflict with competitors, the Lang Organization would join forces with leaders of other violent drug organizations "who were murderous and successful drug dealers in their own right." *Id.* ¶ 9.  Such individuals, as relevant here, include Jose Sanchez and Anthony Ramirez. *Id.*

On October 11, 1995, Lang was riding as a passenger in Sanchez's car and requested that he pull the car over; Sanchez obliged.  *Id.* ¶ 13.  Lang exited the car and began speaking to Curet, whom Sanchez did not know at the time.  *Id.*  At some point in the conversation, Curet retrieved a firearm from his waistband, prompting Lang to withdraw from the conversation and dive into

Sanchez's car. *Id.* Curet proceeded to fire several shots into the back windshield and passenger side of the car. *Id.* Sanchez and Lang sped away, and Lang stated that Curet "is dead." *Id.*

Lang and Sanchez were swift to retaliate. *Id.* ¶ 14. They convened members of the Lang Organization and another nearby drug organization that same night to arrange a murder-for-hire. *See id.* Sanchez offered a $1,000 bounty to Clarence Jackson to kill Curet, half of which Lang agreed to pay. *Id.* Sanchez also "gave [Jackson] a weapon" for the hit, (Rahdert Decl. in Support Mot. to Reduce Sentence ("Rahdert Decl."), Ex. 2 ("Trial Tr."), ECF No. 96–2, 75:11–14), and claimed that he heard Defendant say he was "tired" of Curet and "saw [Defendant] reach into a book bag and grab a gun." PSR ¶ 14. Jackson testified that, from there, he and Ramirez found Curet at a store, hid behind an adjacent ice machine outside the store, and waited for approximately five to ten minutes for Curet to exit the store. (*See* Trial Tr. 939:10–21.) Lang, Sanchez, and other associates watched from the opposite side of the street. PSR ¶ 15. Jackson testified that he did not know where Defendant was during this time. (Trial Tr. 939:16–25.) Defendant was, in fact, also nearby waiting for Curet. *See* PSR ¶ 15. Upon Curet's exit from the store, "Jackson jumped out, ran up to Curet and shot him from behind, in the head, using the 9 millimeter firearm provided to him by" Sanchez, "which caused Curet to fall face-first to the ground." *Id.*; (*see also* Trial Tr. 902:6–10 (Jackson stating, "I ran beside him and shot him one time.").) Then, Ramirez and Defendant "jumped out next, right after Jackson, and each shot several times down towards Curet's body." PSR ¶ 15; *see also* (Mem. in Opp. to Mot. for Reduced Sentence ("Opp."), ECF No. 100, at 5 ("[Defendant] and Anthony Ramirez then ran up and shot at Curet as he lay on the ground.").)

Curet died at the scene. PSR ¶ 15. One of the Government's witnesses, a medical examiner, testified that Curet's cause of death was a "gunshot wound to [the] head," (Trial Tr.

794:22–25), which Jackson indisputably fired.  PSR ¶ 15.  What is not so clear is whether any bullet(s) fired by Defendant made contact with Curet.

Jackson, Ramirez, and Defendant fled the scene and met at a familiar building where the Lang Organization sold drugs.  There, Jackson and Defendant gave Ramirez their guns for disposal. PSR ¶ 15. Later in the evening, Jackson and Defendant met with Lang, who paid Jackson $500 for the murder as promised. PSR ¶ 16. Sometime after the murder, "[Defendant] complained to another manager, who worked for Lang, that he did not receive any money for the murder." *Id.*

Although the murder occurred in October 1995, there was a nearly nine-year delay before Defendant was indicted and then arrested on August 10, 2004.  (Indictment, ECF No. 1; unnumbered docket entry dated August 10, 2004.)  In the intervening period, Defendant began serving a four-to-eight-year sentence in 2000 for attempting to sell narcotics to an undercover police officer and was released on parole on September 25, 2003. PSR ¶¶ 40–41. Upon his release, Defendant "was leading a law-abiding life," as described by the Sentencing Court, and the yearslong delay in indictment presented an "element of tragedy" in its view. (Rahdert Decl., Ex. 4 ("Sentencing Tr."), ECF No. 96, at 4:5–10.) The Government notes that Defendant "found lawful employment and participated in drug rehabilitation programs" during the intervening period. (Opp. at 20.)

Defendant's accomplices received significantly less harsh prison sentences.  Lang did not receive any prison sentence for his involvement in Curet's murder, as he was acquitted of that charge at his trial. Judgment, *United States v. Lang*, 02-cr-1444 (S.D.N.Y. Oct. 18, 2005), ECF No. 65.  However, Lang was found guilty of other crimes in his separate trial and is currently serving a 35-year sentence—specifically, a different murder (20 years) and related narcotics (10 years) and gun convictions (five years). *Id.*

Ramirez's role in the murder is most comparable to Defendant's, but he was not charged for Curet's murder. *See* PSR ¶ 15; *See* Ray Ramirez Presentence Investigation Report ("Ramirez PSR"). He later faced prosecution in a different case, in which his guilty plea initially resulted in a 48-year sentence. Judgment, *United States v. Ramirez*, 98-cr-927 (June 6, 2000), ECF No. 75. Ramirez pleaded guilty to two murder counts related to his personal participation in two other murders—one in which he fired the fatal shots from point-blank range and in the other he directed others to shoot a victim while present at the scene—and three drug distribution counts. *Id.*; *see also* Ramirez PSR ¶¶ 45–46; *United States v. Ramirez*, 571 F. Supp. 3d 40, 43, 49 (S.D.N.Y. Nov. 10, 2021). However, in 2021, Judge McMahon granted Ramirez's request for compassionate release and reduced his sentence to 40 years, but not without an admonishment that Ramirez's conduct—which did not include his participation in Curet's murder—was "among the most serious that ha[d] come before" her court. *Ramirez*, 571 F. Supp. 3d at 52. Ramirez was never prosecuted for his involvement in the murder in this case.

Sanchez ultimately received a sentence of eight years and nine months after cooperating with the government and testifying against Defendant. *See* Am. J., *United States v. Sanchez*, No. 98-cr-968, ECF No. 95; (Def.'s Mem. at 9.) Sanchez admitted his role in Curet's murder and that he was "personally involved in" four other murders and an attempted murder. (Trial Tr. 75: 4–18, 74: 22–24, 117: 19–25, 118: 1–17-18.)

Jackson was the principal perpetrator of Curet's murder, accepting the bounty and firing the fatal bullet. PSR ¶¶ 14–16. Jackson pleaded guilty in a separate indictment to two racketeering counts and one conspiracy to distribute narcotics count, admitting to murdering Curet and to involvement in another murder, among other things. *See* Judgment, *United States v. Ocasio, et al.*, 95-cr-00942-JPC-9 (S.D.N.Y. July 13, 2001) ("Jackson Judgment"), ECF No. 241; (Trial Tr.

at 865.)  Facing a life sentence, Jackson received a 6-year sentence after cooperating with the government and testifying against Defendant.  *See* Jackson Judgment; (Trial Tr. at 869–70.)

## II.    PRIOR PROCEEDINGS

On April 7, 2005, Defendant was found guilty in a trial by jury of the murder of Curet while engaging in a narcotics conspiracy involving 50 grams or more of crack cocaine. (Indictment, ECF No. 1; Jury Verdict, unnumbered docket entry dated April 7, 2005.)  On December 19, 2006, the Sentencing Court sentenced Defendant to life imprisonment.  (Judgment, ECF No. 33.)

Defendant appealed his conviction and sentence claiming that: (1) the Sentencing Court "committed reversible error when it gave supplemental jury instructions in response to a question posed by the jury about the law of aiding and abetting" and (2) "his sentence was unreasonable." *United States v. Van Putten*, 282 F. App'x 950, 951 (2d Cir. 2008).

The Second Circuit affirmed Defendant's conviction, but vacated his sentence and remanded the case to the Sentencing Court for resentencing in light of recent Supreme Court decisions. *Id.* at 953.  In particular, the Second Circuit took issue with "one comment at sentencing that seemed to indicate that perhaps [the Sentencing Court] was not aware of the full breadth of its discretion under *Gall* and *Kimbrough*." *Id.* (referring to *Gall v. United States*, 552 U.S. 38 (2007) and *Kimbrough v. United States*, 552 U.S. 85 (2007)).  The comment at issue was: "[i]n addition, given that most defendants convicted of intentional murder are sentenced to life imprisonment, as well as the fact that no mitigating factors apply to defendant, imposing the statutory minimum sentence of 20 years could conceivably be found to be unreasonable as 'exceeding the bounds of allowable discretion.'" *Id.* (citation omitted).  The Second Circuit interpreted this comment as

indicating that the Sentencing Court perhaps was not aware of its "discretion to deviate from the Guidelines range . . . ." *Id.* (quoting *United States v. Regalado*, 518 F.3d 143, 148 (2d Cir. 2008) (per curiam)) (quotation marks omitted). Thus, the Second Circuit remanded the case with the instruction to "determine whether [the Sentencing Court] was fully aware, at the time it originally imposed its sentence, that [it] had the discretion to deviate from a Guidelines sentence, and thereafter to resentence the defendant accordingly." *Id.* at 953.

On remand, the Sentencing Court again imposed a sentence of life imprisonment. (Judgment, ECF No 48.) Defendant later moved, *pro se*, to vacate this second sentence pursuant to 28 U.S.C. § 2255, arguing that this Court should set aside or correct his sentence on ineffective assistance of counsel grounds. (Mem. Decision and Order, ECF No. 56, at 1.) Specifically, Defendant contended "that his trial counsel was ineffective when he failed to object to a supplemental jury instruction given during jury deliberations." (*Id.*) This Court denied that motion. (*Id.*)

In 2019, Defendant moved to reduce his sentence pursuant to Section 404 of the First Step Act. (Mot. to Reduce Sentence, ECF No. 60.) The relief he sought, however, was later foreclosed by the Second Circuit's decision in *United States v. Gilliam*, 997 F.3d 95, 99 (2d Cir. 2021), leading Defendant to withdraw this motion. (*See* Def.'s Mem. at 1, n.1.)

### III.   LEGAL STANDARD

Save for limited exceptions, a district court "may not modify a term of imprisonment once it has been imposed . . . ." 18 U.S.C. § 3582(c). One such exception is provided in 18 U.S.C. § 3582(c)(1)(A)(i), often called the "compassionate release" statute, which, following an amendment by the First Step Act in 2018, now empowers a defendant to bring his own motion requesting a

reduced sentence. *See, e.g., United States v. Brooker*, 976 F.3d 228, 233 (2d Cir. 2020); *United States v. Rivera-Rios*, No. 20-1773, 2022 U.S. App. LEXIS 29622, at *2 (2d Cir. Oct. 25, 2022); *United States v. Ortega*, No. 99 Cr. 279 (LAP), 2023 U.S. Dist. LEXIS 61076, at *2 (S.D.N.Y. Apr. 6, 2023).

To obtain compassionate release, a defendant must first have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or allowed "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility" before bringing his motion. 18 U.S.C. § 3582(c)(1)(A). Defendant has allowed the 30-day period to lapse before bringing this motion, which the Government does not dispute, and therefore it is properly before this Court. (Rahdert Decl. ¶¶ 2–3, Ex. 7.)

A court may reduce a term of imprisonment pursuant to the compassionate release statute if it finds that (1) the defendant's circumstances present extraordinary and compelling reasons to warrant a reduction, (2) the factors prescribed in 18 U.S.C. § 3553(a) do not outweigh such extraordinary and compelling reasons, and (3) a reduction would be consistent with the relevant policy statements of the Sentencing Commission, i.e., the policy statement in U.S. Sentencing Guidelines Manual § 1B1.13 ("Policy Statement 1B1.13.")   18 U.S.C. §§ 3582(c)(1)(A)–(A)(i); *see also, United States v. Seabrook*, No. 16 Cr. 467 (AKH), 2023 U.S. Dist. LEXIS 30691, at *6 (S.D.N.Y. Feb. 23, 2023) (citations omitted).   The text of Policy Statement 1B1.13 repeats the compassionate release statute's criteria, but includes an additional criterion, that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . . ."

The Sentencing Commission's recent amendment to Policy Statement 1B1.13 implemented discussion and examples of what circumstances constitute extraordinary and compelling reasons warranting a reduced sentence. *Compare* Policy Statement 1B1.13(b) (U.S. Sent'g Comm'n 2023) (amended Nov. 1, 2023), *with* Policy Statement 1B1.13 Application Note 1 (U.S. Sent'g Comm'n 2021) (amended Nov. 1, 2018). Such extraordinary and compelling circumstances include certain circumstances concerning the defendant's medical condition, age, family, or abuse suffered while incarcerated; any other circumstances of a gravity similar to these (a catch-all); and an unusually long sentence. Policy Statement 1B1.13(b)(1)–(6). And while a defendant's rehabilitation "is not, by itself, an extraordinary and compelling reason" for compassionate release, it may serve as one circumstance among others which collectively warrant a sentence reduction. Policy Statement 1B1.13(d).

## IV.   A REDUCTION OF SENTENCE IS WARRANTED

Defendant has established extraordinary and compelling reasons that warrant a sentence reduction. Taken together, the following circumstances suffice as extraordinary and compelling reasons: the Sentencing Court's reliance upon its mistaken belief regarding the frequency of life sentences; Defendant's especially harsh sentence as compared to his accomplices' sentences; Defendant's rehabilitation while incarcerated despite serving a life sentence without any promise of release; and Defendant's young age at the time of the crime. Further, a reduction is consistent with the policy statements in Policy Statement 1B1.13, including, but not limited to, that Defendant is not a danger to the safety of any other person or the community as provided in 18 U.S.C. § 3142(g), and the sentencing factors provided in 18 U.S.C. § 3553(a) weigh in favor of a reduction.

### A. Extraordinary And Compelling Reasons Exist to Grant A Sentence Reduction

### i. The Sentencing Court's Mistaken Belief

When imposing Defendant's original life sentence in 2006, the Sentencing Court noted the Government's assertion that similarly situated, federal defendants typically receive life sentences: "The government contends that similarly situated defendants in the federal system typically receive life sentences, and as such there would not be a sentencing disparity if defendant were sentenced to life imprisonment." (Sentencing Tr. at 25:14–18.)  The Sentencing Court adopted its own version of this assertion, noting that "most defendants convicted of intentional murder are sentenced to life imprisonment," and explaining as one of its final remarks: "[s]o the conclusion that must be reached under these circumstances is that it seems appropriate that Mr. Van Putten be sentenced as most others similarly situated to him are: to life in prison." (*Id.* at 28:11–12, 17–20.)

The Sentencing Court again invoked this belief in Defendant's resentencing in 2008: "Moreover, because similarly situated defendants in the federal system typically receive life sentences, from a nationwide perspective, no sentencing disparity results from imposing a sentence of life imprisonment on defendant." (Resentencing Tr. at 21:21–25.)

However, the data made available by the United States Sentencing Commission, to which both parties cite, indicate that the opposite is true.  Indeed, the median sentences for federal defendants whose primary offense was murder—i.e., federal "defendants convicted of intentional murder," (Sentencing Tr. at 28:11–12)—for fiscal years 2005 through 2010 are:  120 months (FY 2005), 240 months (FY 2006), 235 months (FY 2007), 210 months (FY 2008), 270 months (FY 2009), and 251 months (FY 2010).[2]  In terms of federal defendants whose primary offense was

---

[2] U.S. Sentencing Comm'n, *Average Sentence Length in Each Primary Offense Category,* 2005 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-

murder and, like Defendant, whose criminal history category was V—i.e., federal defendants most

"similarly situated" to Defendant, (Resentencing Tr. at 21:21–25; Opp. at 27–28)—the median

sentences for fiscal years 2005 through 2010 are: insufficient data (FY 2005), 262 months (FY

2006), 276 months (FY 2007), insufficient data (FY 2008), 470 months (which represents life

sentences and all sentences exceeding 470 months) [3] (FY 2009), and 341 months (FY 2010).[4]

---

publications/annual-reports-and-sourcebooks/2005/table13_pre_0.pdf; U.S. Sentencing Comm'n, *Average Sentence Length in Each Primary Offense Category,* 2006 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2006/table13_0.pdf; U.S. Sentencing Comm'n, *Average Sentence Length in Each Primary Offense Category,* 2007 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2007/Table13_0.pdf; U.S. Sentencing Comm'n, *Average Sentence Length in Each Primary Offense Category,* 2008 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2008/Table13_0.pdf; U.S. Sentencing Comm'n, *Average Sentence Length in Each Primary Offense Category,* 2009 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2009/Table13_0.pdf; U.S. Sentencing Comm'n, *Sentence Length in Each Primary Offense Category,* 2010 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2010/Table13_0.pdf.

[3] The Sentencing Commission denotes "life sentences and all sentences above 470 months" as 470 months in the reports referenced herein "to reflect life expectancy of federal criminal defendants more precisely and to provide more accurate length of imprisonment information." U.S. Sentencing Comm'n, *Descriptions of Datafiles, Variables, and Footnotes (Appendix A),* 2009 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2009/Appendix_A_0.pdf.

[4] U.S. Sentencing Comm'n, *Average Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category,* 2005 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2005/table14_pre_0.pdf; U.S. Sentencing Comm'n, *Average Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category,* 2006 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2006/table14_0.pdf; U.S. Sentencing Comm'n, *Average Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category,* 2007 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2007/Table14_0.pdf; U.S. Sentencing Comm'n, *Average Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category,* 2008 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2008/Table14_0.pdf; U.S. Sentencing Comm'n, *Average Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category,* 2009 Sourcebook of Federal Sentencing Statistics,

Thus, although the data do not necessarily show what sentence is typical for similarly situated murder defendants, they all but prove that a life sentence is not.

Consequently, Defendant contends that his life sentence was "premised on a misapprehension about the frequency of life sentences" because the available sentencing data contradict the Sentencing Court's belief regarding the frequency of life sentences. (Def.'s Mem. at 12–14.) The Government responds by first questioning Defendant's chosen federal sentencing statistics, but then immediately concedes that the conclusion drawn by Defendant is nonetheless accurate after evaluating what it views as the proper statistics because the relevant mean and median sentences for Defendant's offense conduct and criminal history category are "still *substantially below* the amount of time [Defendant] has [received]." (Opp. at 27–28 (emphasis added).) The Government argues next that, because the Sentencing Court stated that the need to avoid national sentencing disparities was "merely one of several factors" and that this one factor was "offset by countervailing considerations and the totality of the Section 3553(a) factors," its mistaken belief is therefore insufficiently impactful. (Opp. at 27–28 (quoting Sentencing Tr. at 22.) As a result, in the Government's view, Defendant's "primary argument that this single factor was the driving force behind his life sentence" is negated. (Opp. at 28.)[5]

---

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2009/Table14_0.pdf; U.S. Sentencing Comm'n, *Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category,* 2010 Sourcebook of Federal Sentencing Statistics, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2010/Table14_0.pdf

[5] As an initial matter, the Government confuses the Sentencing Court's analysis under Section 3553(a)(6) as pertaining to a nationwide disparity, when it instead pertained to a co-conspirator disparity. (*See* Opp. at 27–28 (quoting Sentencing Tr. at 22).) The excerpts to which the Government cites related to a *co-conspirator* disparity that Defendant raised at resentencing—(*see* Resentencing Tr. at 22) ("[I]nsofar as [D]efendant asserts that [the Sentencing Court] did not afford sufficient weight to the disparity between his within-guidelines sentence and Jackson's sentence . . . .")—whose import the Sentencing Court discounted in part because of its mistaken belief of the typicality of life sentences, and thus, the alleged co-conspirator

The Sentencing Court's mistaken belief is of serious gravity.  Due process protections command that defendants not be sentenced pursuant to "material false assumptions as to any facts relevant to sentencing . . . ." *United States v. Malcolm*, 432 F.2d 809, 816 (2d Cir. 1970); *see also Gordon v. United States*, No. 10 Civ. 5366 (KMW), 2011 U.S. Dist. LEXIS 72592, at *9 (S.D.N.Y. June 30, 2011).  In *Gordon v. United States*, the court sentenced the defendant pursuant to the applicable sentencing guidelines for a receipt of child pornography offense, assuming the "guidelines were a product of the Sentencing Commission's empirical study and expertise." 2011 U.S. Dist. LEXIS 72592, at *7.  However, a Sentencing Commission report released post-sentencing highlighted that certain increases in the guidelines were instead driven "by Congressional directives that lacked empirical justification." *Id.* at *8.  The court vacated the defendant's sentence on this ground, reasoning that notwithstanding that the sentence was imposed pursuant to a lawful guideline range, the court's "incorrect assumption at sentencing" offended due process rights which require a court to impose a sentence "on the basis of accurate information." *Id.* at *9–10, 15.  The mistaken belief here is of a gravity greater than a misconception as to the empirical nature of certain increases to a lawful guideline. *See id.* at *8. By contrast, no portion of the Sentencing Court's mistaken belief was tethered to empirical study, let alone accurate statistics.

---

disparity was trumped by a purported lack of *nationwide* disparity. (*See* Resentencing Tr. at 22:1–3, 4–6 (citation omitted).) This is an important distinction because the Sentencing Court appeared quite concerned with not creating a *nationwide* disparity, (*see* Resentencing Tr. at 20:23–21:1, 21:22–25), and if equipped with the understanding that a life sentence may create such a disparity along with a disparity among co-conspirators, this understanding could have served as a significant basis to draw the opposite conclusion under Section 3553(a)(6) and, consequently, more reason not to impose a life sentence. Instead, the Sentencing Court was disarmed of this more accurate perspective.

The materiality of the mistaken belief is manifest—Section 3553(a)(6) exists to ensure that defendants are sentenced within relative parameters. A mistake as to where those parameters lie thwarts the entire purpose of this factor and has a distortive effect upon the sentence imposed. Indeed, the Sentencing Court's own words evince the importance it assigned to imposing a sentence which aligned with those of similarly situated defendants, stating very clearly that the mistaken belief was an important basis upon which it relied in imposing a life sentence: "the conclusion that must be reached under the circumstances is that it seems appropriate that Mr. Van Putten be sentenced as most others similarly situated to him are: to life in prison." (Sentencing Tr. 28:17–20); *see also United States v. McDavid*, 41 F.3d 841, 844 (2d Cir. 1994) ("The fact that the trial judge expressly referred to these matters upon imposition of sentence indicates that she probably considered them to be material.") (alteration omitted). Moreover, the Sentencing Court highlighted its belief that "most defendants convicted of intentional murder are sentenced to life imprisonment" as a principal reason underlying its view that a "statutory minimum sentence of 20 years" was potentially an unreasonable, impermissible sentence. (Sentencing Tr. at 28:10–16.) At resentencing, the Sentencing Court placed similar emphasis on its mistaken belief, claiming, "[B]ecause similarly situated defendants in the federal system typically receive life sentences, from a nationwide perspective, no sentencing disparity results from imposing a sentence of life imprisonment on defendant." (Resentencing Tr. at 21:21–25.)

In any event, Defendant is not required to prove that "this single factor was the driving force behind his life sentence" as the Government suggests. (Opp. at 28.) It is enough that the Sentencing Court expressly implicated its mistaken belief as an important ground in imposing Defendant's life sentence. This unquestionably falls in favor of finding that the extraordinary and compelling standard has been met, and is perhaps sufficient on its own.

### ii. Unusually Long Sentence

Defendant argues that the severity of his life sentence is a compelling and extraordinary reason because it created disparities nationally and among his accomplices. (Def.'s Mem. at 14.) As to a nationwide disparity, he claims that a life sentence is incongruent with his status as a secondary participant in the crime, which is supported by the statistics which show that life sentences are reserved for the worst offenders. (*Id.* at 15.) He argues that he is excluded from being within the category of the worst offenders because he did not accept the murder-for-hire contract, nor fire the fatal shot. (*Id.*) Further, he argues that the Government's evidence reflected his secondary role, which caused it to "take the precaution of charging aiding and abetting as an alternative basis for conviction." (*Id.*) The Government disagrees, countering that Defendant was a manager of the Lang Organization who—through his complaints about not receiving any funds for Curet's murder—believed he was sufficiently involved such that he thought his participation warranted remuneration. (Opp. at 28–29.)

With respect to his accomplices, Defendant juxtaposes his sentence with those of Lang, Ramirez, Jackson, and Sanchez to evidence what he views as an unjustified disparity, and adding that, unlike his accomplices, he did not go on to commit any further acts of violence or murders following this crime. (Def.'s Mem. at 15–17.) Specifically, he points to (1) Lang (35 years) and Ramirez (40 years) having received "no more than 20 years for each of their respective murder convictions" even though both held leadership positions and (2) the six- and nine-year sentences for Jackson and Sanchez, who cooperated but had elevated culpability and participated in two and five murders (and Sanchez an additional attempted murder), respectively. (Def.'s Mem. at 16–17.) The Government responds by reiterating the Sentencing Court's reasoning used to reject this

15

argument before—that because certain accomplices cooperated with the Government and/or pleaded guilty, no such disparity exists. (Opp. at 26–27.)

Courts in this District have found sentencing disparities between accomplices as a justifiable basis for a sentence reduction. *See, e.g., United States v. Robles,* 553 F. Supp. 3d 172, 181–82 (S.D.N.Y. 2021) (40 months' probation, one year of probation, and 32 years' imprisonment); *United States v. Fernandez,* No. 10 Cr. 863 (AKH), 2022 U.S. Dist. LEXIS 209086, at *4–5 (S.D.N.Y. Nov. 17, 2022) (two years, 24 months, and two life sentences); *United States v. Millan,* No. 91-CR-685 (LAP), 2020 U.S. Dist. LEXIS 59955, at *47–48 (S.D.N.Y. Apr. 6, 2020) (reducing a life sentence to approximately 28 years where the defendant's co-defendants had the following outcomes: acquitted, 30 years, life imprisonment, life imprisonment reduced to 292 months, time served and 16 months' home confinement, acquitted, life imprisonment reduced to 360 months, acquitted, and life imprisonment reduced to 480 months). Opting for trial instead of pleading guilty or cooperating with the government does not counteract a disparity so as to foreclose the potential for compassionate release. *See e.g., United States v. Ballard,* 552 F. Supp. 3d 461, 468 (S.D.N.Y. 2021); *Fernandez* 2022 U.S. Dist. LEXIS 209086, at *12 (granting a reduction for the defendant notwithstanding, by contrast, his "co-defendants elect[ing] to enter plea agreements or cooperate with the Government").

A glaring disparity exists among these accomplices relative to their culpability in Curet's murder and criminality more broadly across other convictions for heinous crimes. Despite not originating the murder-for-hire plot or firing the fatal bullet, and being implicated in the fewest murders, Defendant received the harshest sentence—effectively being held most accountable for the murder. What's more, "[e]ven for murderers," Defendant's sentence is exceedingly rare, *United States v. Xiang,* No. 02 CR 271 (LAP), 2022 U.S. Dist. LEXIS 120231, at *19 (S.D.N.Y.

July 7, 2022) (citing median sentencing data for the Southern District of New York and the time served for murder sentences imposed in state courts nationwide)—hence no other accomplice receiving a life sentence. *See also United States v. Rodriguez*, 492 F. Supp. 3d 306, 316 (S.D.N.Y. 2020) (discussing "the average federal murder sentence" of 20 years in reducing a life sentence to 30 years for a defendant who "participated in a brutal murder of a government informant"); *United States v. Monteleone*, No. 92-CR-351 (ARR), 2023 U.S. Dist. LEXIS 62518, at *3, 15 (E.D.N.Y. Apr. 10, 2023) (noting that "the national average for a murder conviction is closer to 20 years" in reducing a life sentence to 30 years for a defendant convicted of two murders and conspiring to murder others) (citation omitted).

Defendant's failure to plead guilty or cooperate does not totally negate the existence of these disparities. This is particularly so here because irrespective of their relative culpability for Curet's murder or whether they pleaded guilty, cooperated with the government, or went to trial for this or other murders (and other crimes), all of Defendant's accomplices received sentences substantially below his. Therefore, the corollary is that Defendant's failure to plead guilty or cooperate cannot fill the gap between his and his accomplices' disparate sentences. As such, the disparity between Defendant's sentence and those of his accomplices "weighs in favor of granting a reduction." *Fernandez*, 2022 U.S. Dist. LEXIS 209086, at *12.

### iii. Rehabilitation

Defendant's impressive disciplinary record and extensive rehabilitation efforts further counsel in favor of a reduction. *See e.g., United States v. Torres*, 464 F. Supp. 3d 651, 662 (S.D.N.Y. 2020) ("[The defendants'] strong and sustained rehabilitation contributes to finding 'extraordinary and compelling reasons' for reducing their sentences."). The Government does not contest Defendant's rehabilitative advancement, conceding that Defendant "has taken several

17

educational courses and has exhibited relatively good behavior while incarcerated . . . ." (Opp. at 30.)

Following his arrest in early August 2004, Defendant immediately began pursuing work opportunities and rehabilitation. Indeed, Defendant has apparently worked without interruption from August 2004 through January 2022 (the date of his motion), completing a considerable number of occupational opportunities while incarcerated. (Rahdert Decl., Ex. 8.) Defendant has worked in maintenance, the bakery shop, food service, the kitchen, the dining room, laundry, and as a painter, among other things. (*Id.*) Moreover, evaluations from Defendants' supervisors reflect a strong work ethic and reliability. Defendant's current supervisor, with whom he has worked since June 2020, describes Defendant as a "superior worker" who has "maintained an attitude that is congenial" and is "helpful and has followed instructions always." (*Id.* at Ex. 11.) Another supervisor says Defendant "has demonstrated [a] good work ethic, attitude toward learning, ability to work well with others, and overall work performance and skill." (*Id.* at Ex. 10.)

Defendant has also taken up mentorship and invests his time and efforts in helping others to better themselves. He provides academic tutoring to fellow inmates hoping to obtain a GED, acts as a role model to others by speaking to them about how to remain positive and use their time productively to improve themselves and further their education, and advises younger inmates on issues facing them while in prison and encourages them to make positive choices. (*See, e.g.*, Rahdert Decl., Exs. 20–21.)

Ten fellow inmates have written to this Court on Defendant's behalf, painting a picture of a person dedicated to both rehabilitation and the betterment of others. They describe him as a Christian man and churchgoer who "has always been an inspiration and positive influence on" everyone, including by encouraging "many younger inmates to take advantage of the time [they]

18

have" and "[t]o stay focused and committed to changing for the better." (Rahdert Decl., Ex. 15.) He has a reputation as an "honest and trustworthy" person, who "defies the prison norm of segregation and instead chooses diversity, making friendships with people from all backgrounds." (*Id.* at Ex. 14.) He is a "very good role model" to many people and a mentor who "can relate to troubled teens" that need guidance to avoid a life of incarceration. (*Id.* at Ex. 16.) Indeed, one inmate discusses how he struggled when first entering prison at a young age, but Defendant has since "helped [him] in a lot of ways"—e.g., through academic tutoring, providing guidance and good advice, and "most important[ly,]" by being "a good role model to those around [Defendant] and very respectful." (*Id.* at Ex. 21.) Defendant has helped another an inmate in his journey to obtain a GED diploma by "not only explain[ing] but help[ing] [him] understand the material," and he has witnessed Defendant "do the same with countless other inmates." (*Id.* at Ex. 20.)

Despite a life sentence without the possibility of parole, Defendant has maintained one of the more exceptional disciplinary records, receiving only four minor infractions across 17 years and none since July 2014. (*Id.* at Ex. 8.) He has also completed his GED and at least 230 hours of educational courses. (*Id.* at Ex. 8.) Thus, Defendant's rehabilitation while incarcerated favors a reduction of sentence.

### iv. Defendant's Age at the Time of the Offense

Finally, Defendant's young age at the time of the offense, 21 years old, militates in favor of finding that extraordinary and compelling reasons exist to grant compassionate release. Following significant advancements in neurology and psychology, it is now well-established that the lack of brain development present in youth tends to manifest in immature, risky decision-making out of their control. *See United States v. Ramsay*, 538 F. Supp. 3d 407, 417–18 (S.D.N.Y. 2021) ("[T]he frontal lobes, home to key components of the neural circuitry underlying 'executive

functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life.") (quoting Sara B. Johnson et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolescent Health 216 (2009) (NIH Public Access Version), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/pdf/nihms207310.pdf, at 1.).

The risk of such decision-making is amplified in "high-pressure, time-sensitive, emotional contexts" (also referred to as "hot cognition") or if peer pressure is being imposed. *United States v. Golding*, No. 05-CR-538 (JSR), 2022 WL 2985014, at *3 (S.D.N.Y. July 27, 2022) (quoting *Ramsay*, 538 F. Supp. 3d at 417–20). Consequently, "penological goals apply with much less force to younger defendants in light of their immaturity, susceptibility to peer and other influences, [and] salvageability . . . ." *Golding*, 2022 WL 2985014, at *3 (citing *Montgomery v. Louisiana*, 577 U.S. 190, 208-210 (2016)).

Hot cognition, peer pressure, and salvageability are all applicable here. The initial shooting perpetrated by Curet and the retaliatory murder-for-hire occurred on the same evening, within a matter of hours. The quick turn of events that occurred here reflect a situation in which Defendant was subject to hot cognition. As for peer pressure, Lang and Sanchez—both of whom were leaders of murderous narcotics organizations—ordered the murder in the presence of several gang members and watched the murder unfold, step-by-step. Peer pressure was at play from both gang leaders and peer members. Lastly, Defendant's rehabilitation over the almost two decades while incarcerated is all but emblematic of salvageability.

## B. A Sentence Reduction Is Consistent with Policy Statement 1B1.13

Policy Statement 1B1.13 requires this Court to determine that Defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Defendant's disciplinary record reflects a person who is not a danger to the safety of the community or any other person. Two infractions for phone use, one infraction for "insolence to a staff member," and one infraction for a physical altercation compose Defendant's 17-year history while in prison.[6] (Rahdert Decl., Ex. 8.) The sole infraction involving violence, from 2007, was an altercation in which Defendant was forced to defend himself. Defendant resisted an aggressor who "chas[ed]" him, entered the cell which Defendant occupied, and "pulled a weapon from his coat pocket" with which he stabbed Defendant. (Letter, ECF No. 80.) Lastly, none of Defendant's criminal convictions occurring before or after this crime were for violent offenses.

Accordingly, Defendant is not a danger to the safety of the community or any other person. The circumstances presented simply do not support a finding to the contrary.

## C. The Section 3553 Factors Weigh in Favor of A Reduction

"Application of the § 3553(a) factors requires an assessment of whether the relevant factors outweigh the 'extraordinary and compelling reasons' warranting compassionate release and whether compassionate release would undermine the goals of the original sentence." *Seabrook*, 2023 U.S. Dist. LEXIS 30691, at *6 (cleaned up) (quoting *United States v. Daugerdas*, 613 F. Supp. 3d 807, 2020 U.S. Dist. LEXIS 77658, 2020 WL, 2097653, at *4 (S.D.N.Y. May 1, 2020)).

---

[6] The prison records referenced herein reflect Defendant's educational, employment, and disciplinary records through January 19, 2022. (Rahdert Decl., Ex. 8.)

An assessment of the relevant 3553(a) factors does not outweigh the extraordinary and compelling reasons set forth by Defendant. Having considered the record, the nature and circumstances of the offense, and the history and characteristics of Defendant, a reduced sentence of 30 years would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. 3553(a).

A 30-year sentence is a substantial punishment by any measure, which reflects the seriousness of Defendant's offense and his lack of timely acceptance of responsibility, promotes respect of the law, and is a just punishment. Further, this sentence addresses the sentencing disparities in this case that section 3553(a)(6) seeks to avoid.

It is not lost on this Court that Defendant participated in a heinous crime, committed in furtherance of a violent drug organization. But upon his release, Defendant will be approximately 57 years old, indisputably having paid a hefty price for his crimes as a youth. And by all accounts, Defendant has turned a new leaf, already establishing at this juncture—at age 50, after 19 years of incarceration, and approximately seven years before his release—that he will have been sufficiently punished, and has the propensity to be a productive member of society.[7]

## V.   **CONCLUSION**

Defendant's motion for compassionate release under 18 U.S.C. 3582(c)(1)(A) is GRANTED. Defendant's life sentence is hereby reduced to 30 years. The Clerk of Court is directed to close the open motion at ECF. No 94.

---

[7] The figures provided represent estimations which include good time credits.

Dated: March 27, 2024
      New York, New York

SO ORDERED.

_____

GEORGE B. DANIELS

United States District Judge